# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LEILA SINIO,                         )
                                     )
            Plaintiff,               )
                                     )        Case No. 04 C 4161
      v.                             )
                                     )        Judge Joan B. Gottschall
MCDONALD'S CORPORATION,              )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Leila Sinio ("Sinio") sued McDonald's Corporation ("McDonald's"), her former employer, for, *inter alia*, employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253 (codified as amended at 42 U.S.C. § 2000e *et seq.* (2006)) ("Title VII"). Sinio alleges that McDonald's discriminated against her because she is Asian-American and terminated her employment after she complained about the discriminatory conduct. On May 16, 2005, this court granted in part and denied in part McDonald's motion to dismiss. *See Sinio v. McDonald's Corp.*, 04 C 4161, 2005 WL 1311131, at *1 (N.D. Ill. May 16, 2005). Sinio's remaining claims are for race discrimination in violation of Title VII ("Count I"); retaliation in violation of Title VII ("Count II"); violation of the Illinois Personnel Record Review Act, 820 Ill. Comp. Stat. Ann. 40/0.01 to -13 (West 1999 & Supp. 2006) ("Count IV"); intentional misrepresentation ("Count V"); breach of oral contract ("Count VII"); and negligent misrepresentation ("Count IX"). McDonald's has moved for summary judgment as to each of these claims. For the reasons set forth below, McDonald's motion is granted as to Count V, Count VII, and Count IX, and denied as to Count I, Count II, and Count IV.

# I. Factual Background[1]

Sinio is an Asian-American woman who is trained as an accountant. She received a bachelor's degree in accounting from Dominican University in May of 2000 and shortly thereafter began working as an accountant and bookkeeper for a retail company. She applied for a job with McDonald's, a corporation engaged in the food industry, in early March of 2001. Sinio was interviewed by Debbie Ekhomu ("Ekhomu"), an African-American woman who was the director of McDonald's accounting center in Oak Brook, Illinois ("OAC") at the time. Sinio's original application for hire with McDonald's, which was kept on file with McDonald's Human Resources Department, clearly states that her ethnicity is Asian-American. McDonald's hired Sinio to work at the OAC as a financial analyst, and Sinio remained in this position for approximately ten months. The record reflects that Sinio's performance during that period of time was satisfactory.

On or around January 13, 2002, Sinio was transferred to McDonald's Real Estate Franchise accounting group ("REF"), also located in Oak Brook, Illinois, to begin working as a Home Office Representative ("HO Rep"). She was assigned to a subgroup within the REF referred to as the West Division, which performed accounting functions for franchised and corporately owned restaurants located in the western United States. At the REF, Sinio's direct supervisor was Laura Fink ("Fink"), a Caucasian woman. Fink reported to Karen Crawford ("Crawford"), an African-American woman who was the manager of the West Division. Crawford in turn reported to Ekhomu, who transferred from the OAC to the REF around the same time that Sinio did to become the director of

---

[1] The facts are recited in the light most favorable to Sinio, as is required when a court rules on a motion for summary judgment. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). They are taken from a combination of documents, including Defendant's Local Rule 56.1(a)(3) Statement of Material Facts, Plaintiff's Local Rule 56.1(b)(3)(A) Statement in Response, Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts, Plaintiff's Compendium Volumes I-III, and Defendant's Local Rule 56.1(a) Reply.

the REF.[2]  Sinio had three co-workers who were also employed as HO Reps in the West Division: Antoinette Brown[3] ("Brown"), an African American woman, Issam Abu-Ghallous ("Abu-Ghallous"), a Palestinian man, and Ada Novi[4] ("Novi"), a Caucasian woman.  Each HO Rep in the West Division was responsible for a certain region; Sinio was responsible for the Sierra Pacific region, excluding Hawaii, and the Greater Southwest region.  In must also be noted that all of the African-American employees who worked in accounting at the REF, regardless of rank, were members of an African-American networking organization designed to help African-American employees achieve promotions.

As a HO Rep, Sinio was responsible for communicating with and performing accounting functions for employees of McDonald's and its franchisees in the regions to which Sinio was assigned; a wide variety of job duties was included in this job description.  At the beginning of her employment at the REF, Sinio and several other HO Reps went through a ninety-day training program designed to train them how to perform their various job duties.  The training program was conducted by Shirley Parks ("Parks"), an African-American McDonald's employee, and consisted of both group classes and one-on-one sessions.  During her deposition, Parks testified that the individual training she provided to Sinio during this time was similar to the training she provided to the other HO Reps, including Brown, and that Sinio was progressing at approximately the same rate as the other trainees.  Parks also testified that while the formal training period lasted

---

[2] Ekhomu reported to Senior Director Kelvin McLaurin, who is also African-American.
[3] Michelle Morris ("Morris") was employed as a HO Rep when Sinio first transferred to the REF, but was transferred to the OAC approximately one month later.  After Morris transferred, her position was filled by Brown.
[4] Novi was employed in the West Division as a part-time HO Rep and a part-time HO Rep Coordinator. She reported to Fink, as did all of the other HO Reps.

ninety days, it typically took HO Reps about six months to become proficient at all of their job responsibilities.

On April 8, 2002, while Sinio was still undergoing her initial training, Fink met with Sinio, Brown, Abu-Ghallous, and Novi to divide up Novi's assignments because Novi was going to be on vacation. At that meeting, Fink also discussed general concerns with the West Division, including complaints that had been made by the HO Reps' customers. For example, customers had complained that the HO Reps were not acknowledging or returning voice-mail and e-mail messages promptly and were not processing their requests in a timely manner. Fink also discussed particular areas of concern pertaining to each HO Rep. With respect to Sinio, Fink noted that Sinio's ninety-day review was approaching, discussed several complaints that she had received from customers, and identified an action plan to help Sinio accomplish specific goals (most of which were customer service issues). At some point in this general time period—although the record does not reflect whether it was directly in response to the complaints Fink discussed with Sinio at the April 8th meeting—Sinio complained to Fink that her difficulties were the result of an uneven workload distribution among the HO Reps. According to Sinio, she told Fink that she was being discriminated against based on her race because the other HO Reps, who were not Asian-American, were treated more favorably.[5] These complaints became commonplace during the remainder of Sinio's employment at the REF.

---

[5] For example, Sinio contends that she was responsible for far more restaurants than the other HO Reps based on the regional distribution that existed at the time she was employed at the REF. According to Sinio, she was given a heavier workload because she is Asian-American and her superiors, including Ekhomu and Crawford, favored Brown because Brown is African-American and Abu-Ghallous because they were intimidated by his Middle-Eastern ethnicity. McDonald's disputes all of these allegations, and argues that the workload among the HO Reps while Sinio was employed at the REF was actually very even

On May 13, 2002, Sinio received her Ninety-Day Performance Appraisal Summary ("PAS I"), which was signed by both Fink and Crawford. The PAS I discussed certain aspects of the HO Rep job that Sinio should continue to improve, such as customer service. The PAS I also stated that Sinio "has met the minimum expectations of the Home Office Representative position," "has gained an understanding of her job responsibilities and is exhibiting the skills necessary to perform her job," and "has done a good job of keeping her supervisor informed of her training/work progress and any issues that she has confronted." Pl.'s Compendium, Tab B Ex. 9. According to the PAS I, Sinio "has the potential to be a strong member within the HO rep group." *Id.* At her deposition, Crawford testified that Sinio's PAS I was a typical ninety-day evaluation.

At some point shortly after receiving the PAS I, Sinio met with Crawford to discuss her perception that the workload was not distributed evenly among the HO Reps. Sinio complained that Fink had not addressed the situation, and Crawford agreed to look into the workload distribution. Crawford analyzed the division of labor between the West Division HO Reps, and then informed Sinio that the workload distribution was going to stay as it was. Over the next several months, Sinio continued to complain about the regional distribution of the West Division, repeatedly stating that it reflected racial discrimination. These complaints were made to Fink, Crawford, Ekhomu, and Carol Davis ("Davis"), a Caucasian woman employed as McDonald's Director of Human Resources. Sinio claims that, despite her repeated complaints regarding racial discrimination, her claims were never properly investigated.

---

because Sinio did not take into her calculations that Hawaii was excluded from the Sierra Pacific region. At this point in the litigation, the debate is resolved in favor of Sinio.

In late May of 2002, Chrystal Wilson ("Wilson"), who is African-American, applied for a supervisory training job with McDonald's. Wilson is the stepsister of a man with whom Crawford was having a personal relationship, and Crawford served as a reference on Wilson's application for employment. Wilson was interviewed on July 1, 2002, by Ekhomu, Crawford, and Fink. After the interview, they decided to keep Wilson's application under consideration even though they determined that she was not qualified for a position as a supervisor.

In late June of 2002, Sinio requested a meeting with Ekhomu to discuss her concerns about performance issues and the workload for West Division HO Reps. At the meeting, Sinio raised the same complaints regarding her workload that she had made to her other supervisors, and asked Ekhomu to transfer her back to the OAC. When Ekhomu denied her request, Sinio pointed out that other employees had been allowed such a transfer. Ekhomu told Sinio that she could not transfer back to the OAC until she had been at the REF for at least eighteen months, but told Sinio that she would ask Fink or Crawford to look into the workload distribution again.[6]

On July 9, 2002, Ekhomu met with Davis to discuss Sinio's situation. Ekhomu told Davis that Sinio had been a good employee at the OAC, but that she had refused Sinio's request for a transfer. Ekhomu also told Davis that Sinio had complained about her workload and that Sinio was a minority. On July 10, 2002, Ekhomu held a meeting with Crawford and Fink to discuss what to do about Sinio. Ekhomu, Crawford, and Fink decided to put Sinio on a thirty-day "Goals and Objectives Program" (the "Program"). Def.'s Local Rule 56.1(a)(3) Statement of Material Facts 5. Under the Program, Sinio

---

[6] McDonald's asserts that Ekhomu refused to transfer Sinio because she was subject to an ongoing performance evaluation but, as Sinio points out, the formal performance evaluation that led to her termination did not begin until July 10, 2002.

was given thirty days to improve certain areas of her performance, such as customer service. However, Sinio was not informed about the Program until July 16, 2002. On that day, Sinio met with Ekhomu and Fink, who told her that she was being placed on the Program, retroactive to July 10, 2002. Ekhomu and Fink discussed the various aspects of the Program with Sinio, including the specific areas in which Sinio was expected to improve. They also told her that she was to meet with Fink each week to discuss her progress and that Fink would provide her with regular documentary updates regarding her performance.[7] Sinio was provided with a document setting forth the specifics of the Program, which stated:

> As of Wednesday, July 10th, you will be given 30 days to improve your performance in these areas. If at any time during this process your performance deteriorates, of if you fail to improve your performance in order to meet the minimum expectations, further disciplinary action will be taken up to and including termination of your employment from McDonald's Corporation.

Pl.'s Compendium, Tab B Ex. 10. Shortly after being placed on the Program, Sinio drafted and submitted to her supervisors a written response disputing some of the performance concerns that were set forth in the document.

For the next month, Sinio continued working as a HO Rep in the West Division. She had regular progress meetings with Fink, and Fink provided Sinio with documents detailing her performance in specific areas. Sinio often wrote and submitted memoranda rebutting specific items in Fink's performance assessments. Sinio also continued to complain about the workload distribution and her perception that the inequity was based on racial discrimination. On August 7, 2002, Sinio met with Ekhomu and Fink to discuss her progress. At the meeting, Ekhomu and Fink noted that Sinio had made progress in

---

[7] At her deposition, Fink testified that she was instructed how to document Sinio's deficiencies by Ekhomu and Crawford.

certain areas but that improvement was still necessary, and that Sinio should be able to meet McDonald's expectations in light of additional training she had received during the preceding month.[8]  Based on this meeting, McDonald's decided to continue with the Program.  On August 16, 2002, Sinio was provided with another Performance Appraisal Summary ("PAS II"), which stated that the Program was being extended for an additional thirty days, retroactive to August 7, 2002.  The PAS II noted that the weekly meetings and documentation would continue, and also stated that McDonald's would be contacting Sinio's customers to solicit feedback regarding her performance.  McDonald's did indeed solicit customer feedback, and the record reflects that at least some of the feedback provided by Sinio's customers was positive.  Finally, the PAS II again stated that Sinio would be subject to termination if McDonald's determined that her progress was insufficient.

Throughout the rest of August, Sinio regularly met with Fink regarding her progress and submitted memoranda responding to performance issues raised in the documents provided by Fink.  Sinio also continued to raise the issue of workload distribution amongst the HO Reps, and voiced her concerns regarding racial discrimination to her supervisors.  On September 13, 2002, Sinio was summoned to a conference room to meet with Ekhomu and Crawford.  At the meeting, Sinio was

---

[8] McDonald's asserts that Sinio's performance was still deficient and that it continued to receive customer complaints regarding Sinio during this period of time even though Fink had lightened Sinio's workload by transferring certain assignments to the other HO Reps.  McDonald's may very well be correct that Sinio was under-performing; indeed, many documents in the record reflect that Sinio was not meeting many of the performance criteria set by Fink.  However, as previously noted, the court resolves disagreements in favor of Sinio at this stage.  As discussed below, whether Sinio was meeting McDonald's legitimate expectations is an issue for the jury.

informed that her employment was being terminated.[9]  She was given an envelope containing a separation agreement that had been drafted by McDonald's in-house legal counsel Kathy Moran ("Moran"), asked to turn in her identification badge, and told that she would be escorted out of the building immediately.  Crawford then escorted Sinio from the building and advised her to file for unemployment.

The separation agreement prepared by Moran provided that Sinio's employment would be terminated as of September 20, 2002.  It stated that Sinio would be paid through that date, and that her benefits would terminate at that time.  It also stated that Sinio would be paid for five accrued but unused vacation days within thirty days of her termination.  The separation agreement referenced the Program and stated that Sinio was being terminated due to her failure to meet the goals set forth in the Program.  However, it also provided that Sinio's termination would be treated as a resignation and that McDonald's would provide neutral job references to future employers if Sinio signed the separation agreement.  Finally, the separation agreement required Sinio to relinquish any legal claim she might have against McDonald's.

On September 24, 2006, Wilson was hired as a HO Rep in the West Division, effectively taking over the position previously held by Sinio.  Upon Wilson's hire, the regional distribution in the West Division was reconfigured; as a result, the workload of the HO Reps in the West Division changed.  Wilson was assigned only the Pacific Northwest division, which amounted to less than half the number of stores to which Sinio had been assigned.  Following her hire, Wilson had performance deficiencies similar to some of Sinio's alleged deficiencies, such as customer service issues.

---

[9] According to Sinio, the decision to terminate her had actually been made several days before her meeting with Ekhomu and Crawford.  Ekhomu was the ultimate decision-maker in Sinio's termination, although it appears that the decision was also approved by Davis.

Sinio never signed the separation agreement. Instead, she retained an attorney and, on September 26, 2002, requested her personnel file from McDonald's. The facts surrounding McDonald's compiling of Sinio's personnel file are confusing and full of discrepancies. It appears that Moran asked Davis for Sinio's file. Davis testified that she was the overseer of the personnel files, and that it was McDonald's policy to maintain personnel files for all of its employees. However, it appears that many of the documents that became part of the file eventually given to Sinio made their way to Davis after Sinio requested her file. Most of these documents came up the chain of command: Fink testified that she redacted client information from a number of documents given to her by Ekhomu or Crawford but that she did not give them to Davis directly; Crawford likewise testified that she did not personally send documents to Davis. Davis compiled a large number of documents into a file and gave them to Moran, who reviewed the file to make sure its contents were appropriate. Sinio was then given the file by McDonald's around October 18, 2002. The file contained more than 300 pages of documents, the majority of which reflected the final months of Sinio's employment; at her deposition, Davis testified that the nature of Sinio's file was abnormal. While the file given to Sinio was very large, it did not contain records relating to Sinio's employment at the OAC (such as performance evaluations) or any of the performance rebuttals Sinio had submitted to her supervisors. Sinio therefore sent a letter to McDonald's claiming that the file was missing information and requesting that McDonald's supplement the file. In January of 2003, McDonald's sent Sinio some additional documents, such as her original application for hire (but not the OAC materials or rebuttals). McDonald's now claims that it has given Sinio all of the personnel records in its possession.

Sinio continued to request personnel information from McDonald's through February of 2004. On April 15, 2004, Sinio filed suit against McDonald's in the Circuit Court of Cook County, Illinois. McDonald's removed the case to this court on June 21, 2004, and the parties have been litigating here ever since.

### III. ANALYSIS

McDonald's has moved for summary judgment, requesting that judgment as a matter of law be entered in its favor as to all of Sinio's remaining claims. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact that might affect the outcome of the case under the governing law, and a genuine issue of material fact exists when the non-movant has presented sufficient evidence that a jury could return a verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court construes the facts, and draw all reasonable inferences from them, in favor of the non-movant. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). This standard is applied with particular care in employment discrimination cases, which frequently turn on issues of intent and credibility. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 360-61 (7th Cir. 1998); *Senner v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997).

McDonald's seeks summary judgment on the following claims: (1) race discrimination in violation of Title VII; (2) retaliation in violation of Title VII; (3)

violation of the Illinois Personnel Record Review Act, 820 Ill. Comp. Stat. Ann. 40/0.01 to -13 (West 1999 & Supp. 2006) ("PRRA"); (4) intentional and negligent misrepresentation; and (5) breach of oral contract.[10]  The court considers McDonald's arguments with respect to these claims in turn.

### A.  McDonald's Motion is Denied as to Sinio's Title VII Claim for Discrimination

McDonald's first argues that it is entitled to summary judgment on Count I, Sinio's Title VII race discrimination claim.  Under Title VII, it is unlawful for an employer to discriminate against any employee on the basis of race.  42 U.S.C. § 2000e-2(a)(1) (2006).  A plaintiff can prove unlawful discrimination either through what is referred to as the "direct method" or through the indirect burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719-20 (7th Cir. 2005); *Payne v. Milwaukee County*, 146 F.3d 430, 433 (7th Cir. 1998).  In this case, Sinio contends that she has established a triable issue of fact under both methods.  Accordingly, the court considers each method, as well as the proof offered by Sinio, in turn.

#### 1.  Sinio is Entitled to Proceed to Trial Under the Direct Method

The direct method of proving unlawful discrimination requires that the plaintiff offer evidence, whether direct or circumstantial, of discriminatory motivation.  *See Rudin*, 420 F.3d at 720; *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005).  Direct evidence is that which, if believed, proves that the employer's actions were motivated by discriminatory intent without reliance on inference or presumption.  *See Rudin*, 420 F.3d at 720.  In essence, this requires that the plaintiff point to a tacit

---

[10] Although Sinio pleaded her misrepresentation claims in separate counts, the court groups these claims together for purposes of analysis.

admission of discriminatory intent by the defendant or its agents.  *Id.*; *Jordan*, 396 F.3d at 832.  Not surprisingly, such explicit acknowledgements are rarely made, so plaintiffs proceeding under the direct method do not often rely on direct evidence.  *See Jordan*, 396 F.3d at 832.  Such is the case here; Sinio does not offer any direct evidence, but instead relies on circumstantial evidence to establish her case under the direct method.

A plaintiff can also establish a Title VII violation under the direct method by piecing together enough circumstantial evidence that the trier of fact can infer a discriminatory reason for the employer's actions.  *See Rudin*, 420 F.3d at 720; *Jordan*, 396 F.3d at 832.  The United States Court of Appeals for the Seventh Circuit has recognized three distinct categories of circumstantial evidence that a plaintiff can offer to show intentional discrimination.  The first is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."  *Rudin*, 420 F.3d at 720-21 (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)).  Second, the plaintiff may present "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment."  *Id.* (quoting *Troupe*, 20 F.3d at 736).  Finally, the plaintiff may proffer evidence "that the plaintiff was qualified for the job in question but . . . replaced by . . . a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief."  *Id.* (quoting *Troupe*, 20 F.3d at 336).  Sinio argues that she has evidence from all three

categories that, taken as a whole, is sufficient to allow a jury to infer that McDonald's decision to terminate her was motivated by discrimination. The court agrees.

First, Sinio argues that the timing of certain conduct by McDonald's suggests intentional discrimination. A large part of Sinio's theory in this case appears to be that African-American supervisors at the REF (specifically, McLaurin, Ekhomu, and Crawford), all of whom were members of a networking program for African-American employees, favored African-Americans and discriminated against Sinio. Sinio asserts that her supervisors gave her an inflated workload compared to the other HO Reps when she was first assigned to the REF. Sinio believed that she was being treated differently from the other HO Reps (one of whom was African-American), so she complained to her supervisors that she was being discriminated against because of her race. According to Sinio, she first raised her concerns about the workload and race discrimination in April of 2002, while she was still in her training period, and she continued to complain to her supervisors throughout her employment at the REF. In response, Sinio's supervisors refused to change the regional assignments in the REF and were generally dismissive of her complaints. Led by Ekhomu, they increased their scrutiny of Sinio and began documenting her performance deficiencies in order to build a case for terminating her. In July, shortly after Sinio's supervisors interviewed Wilson, an African-American woman, Sinio was placed on the Program and told that she had thirty days to improve her performance or she could be terminated. At this point, McDonald's documentation of Sinio's performance not only increased dramatically but also became progressively negative. Sinio points out that the contents of her personnel file are mostly documents from the last two months of her employment, and argues that her supervisors basically

papered her file to make her termination appear legitimate. Sinio also notes that Wilson was hired as a HO Rep shortly after Sinio was fired, and that upon Wilson's hire Sinio's supervisors immediately ordered something they had steadfastly refused to grant Sinio—a revision of the HO Reps' regional assignments. Finally, Sinio points to McDonald's compilation of her personnel file, noting that McDonald's put the file together after she requested it, suggesting that McDonald's included only documents that support its position.

McDonald's argues that there is nothing suspicious about the timing of any actions it took with respect to Sinio because Sinio's performance was inadequate from the start and McDonald's was merely documenting Sinio's deficiencies in order to help her improve. However, Sinio has evidence that her performance was adequate and that her performance issues were similar to those of the other HO Reps at the time she allegedly began complaining about race discrimination in April of 2002. Her ninety-day performance review on May 13, 2002, also indicates that Sinio's performance was satisfactory. Thus, Sinio has created a material issue of fact regarding whether an inference of discrimination can be drawn from the timing of McDonald's conduct.

Second, Sinio argues that similarly situated co-workers who were not Asian were systematically treated better than she was. Sinio asserts that African-American employees were given advantages that her supervisors did not give her. Sinio notes that Brown's workload was much less demanding and that Brown was not disciplined as Sinio was even though Brown also had performance deficiencies, and that Wilson benefited from a restructuring in the HO Rep assignments that Sinio's supervisors had refused to grant her. Sinio also alleges that none of the other HO Reps was treated as

harshly as she was, even though Sinio's supervisors raised performance concerns with respect to each of them.  In addition, Sinio argues that other REF employees were allowed to transfer to the OAC, while she was not.

In reply, McDonald's argues that none of Sinio's co-workers "provoked equivalent or comparably persistent customer complaints so as to be similarly situated." Def.'s Reply 8.  McDonald's seems to believe that Sinio's co-workers must be her mirror image in all respects but race in order to be similarly situated.  But this is not the standard.  The question of whether two employees are similarly situated is resolved by considering such factors as whether the employees had the same job description, were subject to the same standards, answered to the same supervisor, and had comparable qualifications.  *See Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005).  The plaintiff is not required to show that she is exactly like the employees who were treated more favorably, but only that she is "substantially similar."  *EEOC v. Circuit City Stores, Inc.*, No. 06 C 4672, 2006 WL 1343173, at *8 (N.D. Ill. May 11, 2006).  Ordinarily, the question of whether two employees are similarly situated is factual and therefore is resolved by the jury rather than the court.  *Id.*

In this case, the court believes that Sinio has presented facts sufficient to create a jury issue as to whether she was similarly situated with respect to her co-workers. Obviously, the other HO Reps had the same job description, were subject to the same standards, answered to the same supervisors, and (presumably) had qualifications similar to Sinio.  *See Bio*, 424 F.3d at 597.  The only question is whether the comparators identified by Sinio should be viewed differently in light of Sinio's alleged performance deficiencies.  *See, e.g., Fuka v. Thompson Consumer Elecs.*, 82 F.3d 1397, 1405-06 (7th

Cir. 1996) (noting that employees who did not have performance problems similar to plaintiff were not similarly situated). Here, however, Sinio has presented evidence that the other HO Reps had some of the same performance problems as she did, particularly during the time period when Sinio first began complaining about race discrimination.

McDonald's argues that Sinio must be found to have been similarly situated to her co-workers at the time of her termination. But the court does not find this argument availing in light of Sinio's contention that her supervisors began constructing a case for dismissing her once she started complaining about the alleged discriminatory workload disparity. If Sinio's contention is true, then it would be impossible for Sinio to demonstrate that her co-workers had similar performance problems around the time of her termination because McDonald's was not manufacturing a reason to terminate them. The parties should account for this issue in their proposed jury instructions; for now, it is sufficient for the court to conclude that Sinio has created a triable issue.

Finally, as set forth above, Sinio notes that her replacement, Wilson, was a non-Asian, and that Wilson was given a much more favorable workload than was Sinio. In reply, McDonald's argues that Sinio has failed to present evidence that McDonald's stated reason for firing Sinio and hiring Wilson—Sinio's alleged performance problems—is unworthy of belief. The court disagrees. At the summary judgment stage, the question is whether Sinio has presented evidence from which a rational factfinder could infer that McDonald's preferred reason for her dismissal was not the true reason she was terminated. *See Rudin*, 420 F.3d at 726. All Sinio must do to reach the jury is cast doubt on McDonald's justification for terminating her; summary judgment is appropriate only when no rational factfinder could find that McDonald's lied about the

reason it terminated Sinio. *Id.* at 726 n.8. This is not the case here. Sinio has presented evidence from which a rational jury could find that McDonald's constructed a basis for terminating Sinio and that its true reason for firing her was discriminatory. Accordingly, the court holds that Sinio has presented sufficient evidence of discrimination under the direct method to create a triable issue of fact.

2. Sinio is Entitled to Proceed to Trial Under the Indirect Method

While the court's holding on the direct method warrants the denial of McDonald's motion for summary judgment on Count I, the court will briefly address the indirect method as well. In order to prove a race discrimination claim by the indirect method, a plaintiff must establish a *prima facie* case under the *McDonnell Douglas* burden-shifting framework. *See Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2006). Under *McDonnell Douglas*, the plaintiff must show that (1) she is a member of a class protected under Title VII; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees who are not members of the protected class were treated more favorably. *Id.*; *see also Russell v. Bd. of Trs. of the Univ. of Ill. at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (same). If the plaintiff is able to establish each element, then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the challenged employment action. *Goodwin*, 442 F.3d at 617. If the employer does so, then the burden shifts back to the plaintiff to present evidence from which a rational trier of fact could conclude that the employer's proffered reason is pretextual. *Id.*

In this case, as Sinio points out, neither element (1) nor element (3) of the *McDonnell Douglas* framework is at issue; Sinio is Asian, a minority group protected by

Title VII, and it is undisputed that her termination was an adverse employment action. The parties do, however, dispute the remaining elements. According to McDonald's, the record demonstrates that Sinio was not meeting its legitimate expectations for months prior to her termination. McDonald's is correct that the record contains a great deal of evidence that Sinio's performance was deficient, and a rational jury could certainly conclude that Sinio was not performing adequately. However, Sinio's *prima facie* burden "is not onerous," *Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 277 (7th Cir. 1995), and the question on summary judgment is whether Sinio has raised an issue of fact on this element. Sinio has clearly done so.

Sinio points to evidence that her performance was sufficient during her training period in April of 2002 and also at her ninety-day review on May 13, 2002. McDonald's disputes these allegations, arguing that Sinio's reviews at this time were only "average," Def.'s Reply 9, but, given that the evidence is in conflict, this factual dispute is for the jury, not the court. McDonald's also argues that Sinio is required to show that she was meeting McDonald's legitimate expectations at the time of her termination, not several months before. *See, e.g.*, *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (finding plaintiff's assertion that she had received positive performance reviews in the past was insufficient to establish a *prima facie* case because the reviews did not indicate she was meeting her employer's legitimate expectations at the time of her termination). The key phrase here is *legitimate*. According to Sinio, McDonald's alleged expectations in July and August of 2002 were themselves discriminatory because they were manufactured in order to justify McDonald's decision to terminate her. As Sinio argues, "[i]t is a question of fact as to whether [Ekhomu and Crawford] steered Sinio's goals and

objectives program in a way that led to Sinio's termination."  Pl.'s Resp. 9; *see also Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179-80 (7th Cir. 1997) (noting that evidence of "phony expectations"—i.e., that an employer's expectations were not bona fide—is sufficient to prevent summary judgment).  Moreover, Sinio has identified at least some evidence indicating that her performance was adequate at the time she was fired.  Specifically, Sinio notes that at least some customers gave McDonald's positive responses regarding Sinio when McDonald's solicited feedback from Sinio's customers in August of 2002.  In short, a jury must determine whether or not Sinio's performance was satisfactory in this case.

There is also a factual dispute, as noted above, as to whether similarly situated employees were treated differently.  As previously discussed, Sinio has presented evidence that her non-Asian co-workers were not treated as harshly as she, and McDonald's assertions that Sinio's performance problems render her not similarly situated to her fellow employees are unavailing at this stage.  Accordingly, the court holds that Sinio can demonstrate a *prima facie* case of race discrimination under the indirect method.

There is little doubt that McDonald's can offer a legitimate, non-discriminatory reason for terminating Sinio; again, the record is replete with evidence that McDonald's found Sinio's performance to be deficient.  This would have the effect of shifting the burden to Sinio to demonstrate that McDonald's proferred reason is pretextual.  *Goodwin*, 442 F.3d at 617.  Again, all that Sinio is required to do at this stage is cast doubt on McDonald's stated reason for terminating her.  *See Rudin*, 420 F.3d at 726.  Sinio has done so.  On the evidence before the court, a reasonable jury could conclude that

McDonald's discriminated against Sinio as compared to the other HO Reps on the basis of race, and that McDonald's reacted to Sinio's complaints of race discrimination by creating an apparently legitimate basis for terminating her rather than addressing the problem. Accordingly, Sinio has established a genuine issue of material fact as to pretext, and she is entitled to a jury determination of her race discrimination claim under the direct method as well. McDonald's motion for summary judgment on Count I is denied.

### B. McDonald's Motion is Denied as to Sinio's Title VII Retaliation Claim

McDonald's also moves for summary judgment on Count II, Sinio's Title VII retaliation claim. Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a) (2006); *see also Luckie*, 389 F.3d at 714 (noting that retaliation against an employee who has complained of discrimination violates Title VII). As with Title VII race discrimination claims, retaliation claims can be proven either through the direct method or the indirect *McDonnell Douglas* method. *See id.* Again, Sinio opposes McDonald's motion for summary judgment on Count II under both methods of proof. The court will address each method in turn.

### 1. Sinio Cannot Proceed to Trial Under the Direct Method

The direct method of proving retaliation differs from the direct method applicable to race discrimination claims. In order to survive summary judgment on a retaliation claim based on the direct method, the plaintiff is required to present direct evidence that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment

action; and (3) there is a causal connection between the protected activity and the adverse action.  *See id.*; *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2001).  If the plaintiff does so, and the plaintiff's direct evidence is unrebutted, the plaintiff is entitled to summary judgment.  *See Stone*, 281 F.3d at 644.  If, however, the plaintiff's evidence is contradicted, then a trial is necessary unless the defendant presents unrebutted evidence that the adverse action would have been taken against the plaintiff regardless of discriminatory motive; in that case, the defendant is entitled to summary judgment because it has been proven that retaliation was not the cause of the plaintiff's injury.  *Id.*

Importantly, the Seventh Circuit has repeatedly stated that the direct method in retaliation cases requires *direct evidence*—i.e., non-circumstantial evidence that establishes retaliation without the need for inference.  *See Luckie*, 389 F.3d at 714; *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004); *Stone*, 281 F.3d at 644.  *See also Circuit City*, 2006 WL 1343173, at *6.  In this case, Sinio has presented direct evidence regarding only two of the three requirements under the direct method.  Specifically, Sinio points to direct evidence—primarily her own deposition testimony—that she complained to her supervisors about racial discrimination.  McDonald's argues that Sinio never complained that she was being discriminated against because she is Asian, but this argument is unpersuasive because Sinio points to record evidence that she complained about *racial* discrimination, which is sufficient.  *See, e.g.*, *Circuit City*, 2006 WL 1343173, at *4-5 (rejecting argument plaintiff could not have been retaliated against because he never complained about discrimination on the basis of age or national origin).

Sinio also points to direct evidence that she suffered an adverse employment action: she was fired.

Nonetheless, Sinio's claim fails under the direct method because she has presented no direct evidence to show that she was fired *because* she complained about race discrimination. Sinio argues that she can establish causation by pointing to "a chronology of events from which retaliation may be inferred." Pl.'s Resp. 12. Such evidence may be sufficient to create a triable issue on a race discrimination claim under the direct method, but the Seventh Circuit has made clear that circumstantial evidence is not sufficient in retaliation cases. *See Stone*, 281 F.3d at 644. What is apparently required here is direct evidence; i.e., the rare "outright admission by the decisionmaker that the challenged action was taken for retaliatory reasons." *Circuit City*, 2006 WL 1343173, at *6. Therefore, Sinio cannot proceed on her retaliation claim under the direct method.

### 2. Sinio is Entitled to Proceed to Trial Under the Indirect Method

While Sinio cannot try her retaliation claim under the direct method, she is entitled to proceed under the *McDonnell Douglas* burden-shifting framework, which operates in almost the same manner in the retaliation context as it does in the race discrimination context. To establish a *prima facie* case of retaliation under the indirect method, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees that did not engage in the statutorily protected activity. *See Luckie*, 389 F.3d at 714; *Stone*, 281 F.3d at 644. If the plaintiff makes out a *prima facie* case, the

employer must offer a legitimate, nondiscriminatory reason for the adverse action. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). If the employer is able to do so, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason is pretextual. *Id.* Each of these facets has already been addressed, and the court need not belabor the point. Sinio has done her part to establish material issues of fact regarding the pertinent elements, and therefore is entitled to try her retaliation claim. McDonald's motion for summary judgment on Count II is denied.

### C. McDonald's Motion is Denied as to Sinio's Claim Under the PRRA

McDonald's next argues that that the court should grant summary judgment on Count IV, Sinio's claim under the Illinois Personnel Record Review Act, 820 Ill. Comp. Stat. Ann. 40/0.01 to -13 (West 1999 & Supp. 2006) ("PRRA"). Under the PRRA, an employer that maintains personnel records of its employees must, upon request, permit an employee to inspect all personnel documents in its possession that "have been or are intended to be used in determining that employee's qualifications for employment, promotion, transfer, additional compensation, discharge or other disciplinary action." *Id.* § 40/2. The employer must provide the employee the opportunity to inspect his or her personnel file within seven business days following the request, although the employer can receive an additional seven days "if the employer can reasonably show that such a deadline cannot be met." *Id.* The inspection should usually take place during working hours and "at a location reasonably near the employee's place of employment," although other arrangements can be made for the convenience of the employee. *Id.* If the employee "is unable to review his or her personnel record at the employing unit, the employer shall, upon the employee's written request, mail a copy of the requested record

to the employee." *Id.* If the employee disagrees with any information in the personnel record, the employer and employee may mutually agree to remove or correct the offending information. *Id.* § 40/6. If no such agreement can be reached, however, the employee is entitled to submit a written statement disputing the information, which the employer is required to attach to the disputed portion of the record and include whenever the disputed portion of the record is released to third parties. *Id.* If an employer is found to have violated the PRRA, the court may order it to comply and is required to award the employee actual damages and costs. *Id.* § 40/12(c), (d)(1). If the employer's violation was willful and knowing, the employee is entitled to "$200 plus costs, reasonable attorney's fees, and actual damages." *Id.* § 40/12(d)(2).

McDonald's argues that Sinio's PRRA claim boils down to her mere displeasure that her personnel file is missing documents she thinks should be included and contains documents she thinks should be purged. The record, however, indicates that Sinio's assertions go much further. Sinio, through her attorney, requested a copy of her personnel file from McDonald's on September 26, 2002. As noted in the factual recitation above, the record is muddy regarding the manner in which McDonald's assembled Sinio's file, but it appears that numerous documents were given to Davis by Sinio's supervisors, and that Davis compiled them and then gave them to Moran to review. Sinio then received the purported personnel file from McDonald's on October 18, 2002. The file originally given to Sinio contained over 300 pages of documents, the vast majority of which related to her final months of employment. Conspicuously absent, however, were her original application, resume, records relating to Sinio's employment at the OAC, and the numerous performance evaluation rebuttals Sinio had prepared. Sinio

informed McDonald's that the file was missing information and, on January 30, 2003, McDonald's produced her application and a few other assorted personnel records, but no OAC records or rebuttals.

McDonald's arguments are a virtual repeat of those made in its motion to dismiss, which the court denied as to Count IV; McDonald's again argues that the PRRA does not prevent over-inclusiveness and does not require an employer to remove documents at an employee's whim. *See Sinio v. McDonald's Corp.*, No. 04 C 4161, 2005 WL 1311131, at *2 (N.D. Ill. May 16, 2005). McDonald's is correct on this point, but its argument is irrelevant. *Id.* § 40/2. The PRRA does require an employer to make available all personnel documents that have been or are going to be used to make employment decisions within seven days of the employee's request. *Id.* The personnel file McDonald's originally provided to Sinio was not only untimely,[11] but did not include documents that should have been included under the PRRA, such as Sinio's original employment application and OAC records (to the extent any exist—McDonald's claims they do not). The PRRA also provides that when an employee submits a written statement rebutting information in a personnel document, the employer must include the statement with the disputed portion of the employee's personnel file. *Id.* § 40/6.

_____

[11] McDonald's argues that it was only required to meet the seven day requirement for on-site inspection, and that there is no applicable time limit for mailing a copy of a personnel file to an employee. The court does not read the PRRA in this manner. The PRRA makes clear that an employee is entitled to inspect his or her personnel file within seven (or, if the employer can show hardship, fourteen) days after a request is made, and that the employer should accommodate the employee regarding the time and place of inspection. 820 Ill. Comp. Stat. Ann. 40/2. If an employee "is unable to review his or her personnel record at the employing unit," the employer must mail a copy of the file to the employee. *Id.* While the latter provision does not specify a time limit, it would be unreasonable to assume that none was intended because both provisions are part of the same section and the mailing provision appears to be merely another way of ensuring prompt access to an employee's personnel file when the employee cannot inspect it on the employer's premises. The mailing provision makes particular sense, where, as here, the employee has been terminated and escorted off the premises but wants to review the contents his or her file. Even if the court did not interpret the PRRA in this manner, however, Sinio has sufficiently established other violations of the PRRA, discussed above, to merit a trial of Count IV.

McDonald's argument that Sinio did not request the opportunity to submit a rebuttal after she received the file is not persuasive.  It is undisputed that while she was employed at McDonald's Sinio disagreed with information contained in many documents (such as performance evaluations) that ultimately became part of her personnel file, that she typed and submitted to her supervisors numerous rebuttals to these documents, and that the personnel file given to Sinio did not include any of her rebuttals.  The absence of these rebuttals is highly suspicious, and the court does not read the PRRA to require Sinio to submit them twice (nor could she, for they were apparently stored on her computer at the REF).

Taken as a whole, the gist of Sinio's PRRA claim seems to be that McDonald's manipulated her file to support its position that she was fired exclusively for poor performance.  Sinio points out that McDonald's assembled her purported personnel file only *after* she requested it, allowing McDonald's the ability to pick and choose what information to include, and that the file does not include documents known to exist that would weaken McDonald's decision to terminate her.  Sinio's claims, if proven, would entitle her to relief, and she has established enough support for her position to warrant a trial.  McDonald's motion for summary judgment on Count IV is therefore denied.

### D.  McDonald's Motion is Granted as to Sinio's Misrepresentation Claims

McDonald's also moves for summary judgment on Sinio's state law claims for misrepresentation, Counts V and IX.  Initially, Sinio's claim for negligent misrepresentation, Count IX, fails because, as McDonald's points out, Illinois does not recognize such a claim in this context.  *See Brogan v. Mitchell Int'l, Inc.*, 692 N.E.2d 276, 278 (Ill. 1998).  An essential element of negligent misrepresentation is the duty to

communicate accurate information, and under Illinois law this duty exists in only two circumstances: (1) if injury to person or property will result; and (2) if the person communicating the information is in the business of supplying information to guide others in business transactions. *Id.* Neither of these circumstances is present here, and so McDonald's motion for summary judgment is granted with respect to Count IX.

The same result follows for Sinio's claim for intentional misrepresentation, Count V. Under Illinois law, intentional misrepresentation—i.e., fraud—requires proof of the following elements: (1) a false representation of material fact; (2) the defendant knew the representation was false; (3) the plaintiff had a right to rely on the representation and did so; (4) the representation was made for the purpose of inducing to plaintiff to act or refrain from acting; and (5) the representation caused injury to the plaintiff. *See Hefferman v. Bd. of Trs. of Ill. Cmty. Coll. Dist. 508*, 310 F.3d 522, 525 (7th Cir. 2002); *Wright v. Chicago Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1990).

In this case, Sinio's claim fails on the first element. Sinio's intentional misrepresentation claim is based on two arguments regarding the separation agreement McDonald's presented to her on September 13, 2002, the day she was informed that her employment was terminated. First, Sinio notes that the separation agreement provided that, if she signed it, her termination would be deemed a resignation and she would be given a neutral reference. Sinio argues in the negative that McDonald's did not tell her what would happen if she did *not* sign the separation agreement. According to Sinio, this constitutes fraud on behalf of McDonald's because McDonald's proceeded to "cram her personnel file with more than 300 pages of prejudicial documentation . . . deny her unemployment benefits . . . deny her earned, but unused, vacation pay, and [fail to] return

phone calls to recruiters," all consequences that McDonald's did not tell her would follow from her failure to sign.  Pl.'s Resp. 14.  But this argument does not establish that McDonald's affirmatively represented anything to Sinio, only that McDonald's did *not* do so.  Second, Sinio points out that the separation agreement stated that, if Sinio signed it, she would be paid for five accrued but unused vacation days within thirty days of her termination.  According to Sinio, she believed that this clause allowed her thirty days to consider the separation agreement.  Again, there is no affirmative representation by McDonald's present in this allegation.  Furthermore, Sinio's interpretation is completely unfounded, and therefore Sinio cannot establish that she had a right to rely on the separation agreement in this manner.  *See Hefferman*, 310 F.3d at 525.  Accordingly, McDonald's motion for summary judgment is granted as to Count V as well.

### *E.  McDonald's Motion is Granted as to Sinio's Breach of Oral Contract Claim*

Finally, McDonald's argues that summary judgment should be granted as to Count VII, Sinio's state law claim for breach of oral contract.  McDonald's argues that Sinio has not produced any evidence that is sufficiently clear or definite to support her claim that McDonald's promised her that it would employ her until at least December 31, 2002.  The court agrees.

Under Illinois law, an employment relationship without a fixed term is presumed to be at-will, and the employer can terminate the employee at any time and for any reason.  *See LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 563 (7th Cir. 1991); *Tolmie v. United Parcel Serv., Inc.*, 930 F.3d 579, 580 (7th Cir. 1991).  The presumption is not absolute, and may be overcome by a showing that the parties contracted otherwise. *LaScola*, 946 F.3d at 563.  The plaintiff can rebut the at-will presumption by

demonstrating that the parties entered an oral contract to continue the employment relationship for a fixed duration. *See Kalush v. Deluxe Corp.*, 171 F.3d 489, 492 (7th Cir. 1999); *Tolmie*, 930 F.2d at 581. To establish the existence of an oral contract, however, the plaintiff is required to show that the terms of the oral offer are clear and definite. *See Kalush*, 171 F.3d at 492; *LaScola*, 946 F.2d at 564-65; *Tolmie*, 930 F.2d at 581.

In this case, Sinio has not offered anything approaching clear and definite contractual terms. In her response brief, Sinio argues that Fink gave her "a six-month individual performance plan and year-end assessment" ("the plan") that contained certain performance objectives on August 1, 2002. Pl.'s Resp. 15. According to Sinio, the plan designated December 31, 2002, as the date to complete the objectives, and this date was referred to by Fink as the "target date."[12] *Id.* But Sinio's reliance on the plan as a basis for establishing an employment contract of a specific duration is foreclosed by this court's order of May 16, 2005, which granted McDonald's motion to dismiss Sinio's breach of written contract claim. *Sinio*, 2005 WL 1311131, at *3-4. In that order, the court held that the plan did not create a contract; it specifically states that Sinio's employment is at-will. *Id.* at *4. The court therefore dismissed Count VII to the extent it was based on a written contract, but allowed Sinio's breach of oral contract claim to survive because McDonald's had made no argument regarding that aspect of Count VII. *Id.* Having lost her argument that the plan established a written employment contract, Sinio cannot now rely on the plan as a basis for establishing an oral contract.

Moreover, Sinio cannot point to anything to show that anyone at McDonald's orally promised to employ her until December 31, 2002. In her response brief, Sinio only

---

[12] The document to which Sinio refers only states that the date to complete the objectives is December of 2002, not December 31, 2002.

argues in the negative that "Fink never told Sinio that she would *not* be given until December 31, 2002 to complete her year-end assessment goals." Pl.'s Resp. 15 (emphasis added). This assertion is irrelevant; the question here is what Sinio *was* told, not what McDonald's failed to tell her. McDonald's cannot be held to an oral employment contract simply because it did not refute Sinio's assumption that she would be employed until December 31, 2002, particularly when that assumption was based on a document that specifically states that her employment was at-will.

Sinio's deposition testimony makes perfectly clear that she cannot demonstrate an offer sufficiently clear and definite to support her breach of oral contract claim. At her deposition, Sinio was asked multiple times about her contention that she was promised employment until December 31, 2002. Specifically, Sinio was asked who made the promise to her and what was said. In response, Sinio repeatedly stated that she could not remember, and was able to provide no specific information about the alleged offer. Thus, there is no issue of material fact with respect to Sinio's breach of oral contract claim. Accordingly, McDonald's motion for summary judgment is granted as to Count VII.

## IV. CONCLUSION

For the foregoing reasons, McDonald's motion for summary judgment is granted in part and denied in part. The court grants McDonald's motion as to Count V, Count VII, and Count IX, and denies it as to Count I, Count II, and Count IV.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 19, 2007